ABNER TAYLOR *et al.*

*v.*

HIRAM A. MERRILL.

1. ALLEGATIONS AND PROOFS *must correspond.* In a suit to compel the specific performance of a contract, the complainant can not obtain relief upon a contract different from that set out in his bill.

2. AGENT—*parol authority to sell land.* It is not doubted that parol authority to an agent is sufficient to enable him to bind his principal by a contract in writing for the sale of land; but such authority must be clear and explicit.

3. AGENT—*must act within his authority.* If a party authorizes an agent to make a certain contract for him, it does not follow that the agent may make another and different contract and yet bind the principal; and especially is this true where the party with whom the agent contracts knows the extent of the agent's authority.

4. STATUTE OF FRAUDS—*when not necessary to be pleaded.* Where a bill for specific performance sets out a contract in writing as the alleged ground of relief sought, it is not necessary the defendant should plead the statute of frauds in anticipation of an attempt on the part of the complainant to prove a parol contract for the sale of land. It is time enough to plead that statute when it is alleged the defendant has made a contract which is within its purview.

5. SPECIFIC PERFORMANCE—*unreasonable delay.* All contracts for the sale of lands, where time is not of the essence thereof, must be performed or rescinded within a reasonable time, and if there has been any unreasonable delay that can not be explained consistently with good faith, equity will always hesitate to enforce a specific performance.

6. So where a party claiming to have purchased a tract of land, sought to compel a conveyance thereof, it appeared the alleged contract was made April 14, 1868, and by its terms a large part of the purchase money was to be paid at that time. When the vendor, in the latter part of that month, tendered a deed and demanded payment, the purchaser insisted upon conditions not embraced in the contract, and declined to pay unless they were complied with, and made no tender of the money until the seventh of July following: *Held,* there was no reasonable excuse for the delay in tendering performance on the part of the purchaser, and before equity would assist him he must himself have been diligent in his efforts to comply with the contract on his part.

7. SAME—*of the good faith required.* If there be any unfairness or rep-·rehensible means used in obtaining the making of a contract, equity will never enforce a specific performance.

APPEAL from the Circuit Court of Cook county; the Hon. ERASTUS S. WILLIAMS, Judge, presiding.

The opinion states the case.

Messrs. HIGGINS, SWETT & QUIGG and Messrs. BECKWITH, AYER & KALES, for the appellants.

Mr. WILLIAM C. GRANT and Mr. JOHN WOODBRIDGE, for the appellee.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

The questions involved in this record are more of fact than of law. The only difficulty in the case is, to ascertain accurately the facts established by the evidence.

It is a familiar rule in pleading, that a party can not set out one contract in his bill, and yet obtain relief on another and different one shown by the evidence. For this reason it becomes important to inquire, what issues the parties themselves have presented for the consideration of the court by their bill and answers.

On the eighth day of July, 1868, Hiram A. Merrill filed his bill in the circuit court of Cook county, in which it is alleged that on and prior to the fourteenth day of April, 1868, Abner Taylor was the owner of a certain piece of land in the city of Chicago; that Merrill was desirous to purchase, and Taylor to sell the same, and that on or about the fourteenth day of April, 1868, Taylor executed and delivered to him his certain memorandum of agreement or contract, in writing, for the sale and conveyance of the premises, which agreement is set out at length in the bill, and is signed Philpot and Pickett, agents for A. Taylor.

It is alleged that the contract was duly stamped, and was, on the twenty-seventh day of April, 1868, filed for record in the recorder's office for the county of Cook, and was duly recorded.

The other defendants named in the bill are subsequent purchasers of certain parcels of the premises from Taylor, and it is alleged that they purchased the same with full knowledge of the equities of Merrill in the premises.

It is also alleged in the bill, that Merrill has always been ready and willing to perform all things on his part of the agreement or contract, and that, on the seventh day of July, 1868, having previously become satisfied that the title to the premises was duly vested in Taylor, he tendered and offered to pay him $10,000, and $150 in addition thereto as interest thereon, and demanded of Taylor a conveyance of the premises in accordance with the terms of the agreement, which Taylor refused to make.

The prayer is for a specific performance of the particular contract set forth in the bill.

The answer of Taylor admits that he was the owner of the premises at the time stated in the bill, but denies that he ever made and executed the memorandum of agreement or contract set out in the bill. He also explicitly denies that Philpot & Pickett were ever, or either of them, in any manner authorized or empowered by him to make the contract set forth in the bill, or any other agreement or contract for him, or in his behalf, in regard to the premises in question.

Taylor avers that the only authority Philpot & Pickett ever had from him was to look up a purchaser, and, when found, to bring such purchaser to him to complete the sale.

From this statement of the pleadings, we may learn the exact questions involved in this controversy. They are simply these : Did Philpot & Pickett, or either of them, ever have any authority from Taylor to make and sign the memorandum of agreement on his behalf, for the sale of the premises, which was delivered to Merrill? and if they, or either of them, had such authority, was the contract so fairly obtained by Merrill that equity will decree a specific performance?

The authority to Philpot & Pickett to execute and deliver the contract on behalf of Taylor being explicitly denied, the burden of proof must rest on the appellee, to show authority in the agents to make and execute the contract on his behalf. It is not doubted that parol authority would be sufficient for this purpose, but then it must be clear and explicit, and not clouded with any uncertainty. A party may not be deprived of his property without his consent, and where an agent undertakes to bind his principal in a contract for the conveyance of real estate, his authority so to do must be certain and specific.

It appears in the early history of this transaction, that Taylor and one Campbell owned the land in controversy together; that Taylor afterwards purchased the interest of Campbell, and that he owed him $10,000 on the purchase; that the amount was about to fall due, and Taylor, being in need of funds, desired to sell the property in controversy to raise the money with which to pay this debt to Campbell. It was at this time that Pickett was first introduced to Taylor. This was in the month of March, 1868. Nothing of any importance occurred at the first interview between Taylor and Pickett. At a subsequent interview between the parties, had shortly afterwards, it appears from the testimony of Pickett that Taylor then authorized him to sell the property for $19,000, the purchaser to pay $10,000 in cash, and to assume the payment of a mortgage on the premises of $9000, and that Taylor would pay him $400 commission for making the sale, in case a sale should be effected. But no sale was effected at that time, or under the authority then given.

In the meantime, Taylor borrowed the money and paid the debt that was pressing on him, due to Campbell.

Taylor was then about to start, and did go south, to Memphis. It appears that he was still anxious to sell the property on the terms proposed, and told Pickett that if he could sell the property, or find a purchaser during his absence, to telegraph him at Memphis.

During the absence of Taylor in the south, negotiations continued between Pickett and Merrill for the sale of this property. Merrill was anxious to buy, but wanted more favorable terms than Pickett was then authorized to offer to him. Pickett distinctly disclosed to him, at that time, the full extent of his authority from Taylor in the premises, and that was, to sell the property for $19,000, the purchaser to pay $10,000 cash, and to assume the payment of a mortgage on the premises of $9000.

It appears from the evidence, that the city of Chicago was, at that time, about to, or had opened Adams street across the premises, and Merrill wanted to have the value of Adams street deducted from the price of the land. He also desired to get the privilege of paying the mortgage in instalments, in case the land should be afterwards subdivided and sold in lots. It is not doubted that Pickett then expressly told Merrill that he had no authority whatever from Taylor to make a contract for him that would except Adams street, or that would give him the privilege of paying the mortgage in instalments.

Pending these negotiations between Pickett and Merrill, Taylor returned to Chicago, perhaps on the thirteenth day of April. On the next day after his return, Taylor met Pickett in the street, and Pickett then told him that he wanted to introduce to him a man who desired to purchase his property; that he did not know whether he would buy or not, but that it would do no harm to talk the matter over. Accordingly, on the next day, the fourteenth day of April, Pickett and Merrill went to the office of Taylor.

The principals then commenced to negotiate about the sale of the property. They discussed between themselves the question of deducting Adams street, and paying the mortgage by instalments, so much per lot, as the same should be sold in case the premises should afterwards be subdivided. Pickett was present during a part of this interview, but went away and left the parties in the office still negotiating. The evidence shows that the principals came to no understanding or conclusion at that interview, with reference to the sale of the property.

It is insisted by the appellee that, on the same day, after this interview between the principals, Philpot & Pickett executed and delivered to him, on behalf of Taylor, the contract set forth in the bill.

The authority in the agents to make this contract being expressly denied, it becomes important to inquire when, if at all, Taylor conferred upon them the authority to execute this contract for him and in his behalf. By the testimony of Pickett, preserved in the record, and by his express declaration to Merrill, previously made, they certainly had no such authority previous to the interview between the principals on the fourteenth day of April. Pickett does not even testify that Taylor gave him any new authority on that day to execute the contract, or, indeed, to make any contract on his behalf, and the utmost that he says on that question is, that he understood that Taylor was willing to stipulate, in case a sale was effected, that the mortgage should be released on the payment of a certain sum per lot, as the same should be afterwards sold. Taylor, however, testifies that he gave Pickett no new authority whatever on that day to do anything about the sale of the premises in his behalf, and in this he is, to some extent, corroborated by the other witnesses present.

If a party authorizes an agent to make a certain contract for him, it by no means follows that the agent may make another and different contract, and yet bind the principal; and especially is this true if the party with whom the agent contracts, knows the extent of the agent's authority in the premises.

The evidence bearing on the authority of the agents to make this particular contract, is very conflicting and unsatisfactory, and much of it, we must say, is totally irreconcilable. But after a careful inspection of the evidence, we are unable to find that clear and distinct authority which the law undoubtedly requires in the agents, to make the contract alleged in behalf of the appellant, Taylor. We may safely say that the evidence of the authority of the agents is not so satisfactory that a court of equity would, over the express denial of the principal, enforce a specific performance of the contract.

It is insisted, on the part of the appellee, that at a subsequent interview between the parties, Taylor verbally made a contract with Merrill to sell him the property, in substance the same as the written one set out in the bill, and inasmuch as the statute of frauds is not pleaded by the appellant, Taylor, that a specific performance of the verbal contract, so made, may be enforced in this proceeding. The doctrine insisted upon is, that, notwithstanding a written contract has been pleaded, the appellee may prove a verbal contract to the like effect, and still be entitled to have it enforced if the statute of frauds be not pleaded.

We are referred to the case of *Esmay* v. *Gorton et al.* 18 Ill. 483, as sustaining this view of the law. We do not understand that case to lay down any such rule. From the statement of facts, we would understand that the bill, in that case, did not allege that the contract between the parties was reduced to writing. The contract was a verbal one between the agent and the purchaser, and it is so alleged. The agent was fully authorized by the principal, in writing, to make the contract in his behalf. The court held that the statute of frauds not having been pleaded or set up in the answer, no question could arise upon the admission of parol evidence to establish the contract.

We are at a loss to understand how a party can be called upon to plead the statute of frauds to a parol contract for the conveyance of land, when he is not charged with having made such a contract. It could hardly be required of him to anticipate that the other party would prove a parol contract, when it is alleged that the existing contract was reduced to writing by the deliberate acts of the parties. It will be time enough for him to plead the statute of frauds for his defense when it is alleged against him that he has made a contract that comes within the purview of that statute.

We are not satisfied, from the evidence, that the verbal contract insisted upon by the appellee, was, in substance, exactly the same as the alleged written one. By the verbal contract

alleged the cash payment of ten thousand dollars was to have been made within ten days. By the written one no time is specified in which the cash payment shall be made. By the verbal contract, as testified to by all parties, Taylor expressly refused to convey the land taken by the city for Adams street. By the terms of the written one he would be bound to do so, or answer for the breach of his covenants if the contract was enforced. The land taken for Adams street is not excepted, but is included, in the terms of the written contract.

All contracts with reference to the sale of lands, where time is not of the essence of the contract, must be performed or rescinded within a reasonable time, and if there has been any unreasonable delay that cannot be explained consistently with good faith, equity will always hesitate to enforce a specific performance of the contract.

There is no evidence whatever that the appellee ever tendered any money in compliance with the contract, as he alleges he made it by parol, until the seventh day of July, 1868. When appellant, Taylor, called upon him on the twenty-eighth or twenty-ninth of April, 1868, and tendered a deed for the premises and demanded payment, appellee imposed conditions precedent, not to be found by any fair construction either in the written or parol contract. Appellee then demanded and insisted that Taylor should first procure the releases for lots to be afterwards sold by him before he would pay the money. The only fair construction that can be given to the contracts, both the written and verbal ones insisted on, is, that Taylor was to sell the property for nineteen thousand dollars, the purchaser to pay ten thousand dollars cash in hand, and assume the payment of the mortgage of nine thousand dollars, and in case the premises should afterwards be subdivided, Taylor would procure from the party holding the mortgage releases for the several lots, as the same should be sold, on the payment of a certain stipulated instalment. The appellee, therefore, could not properly make the procuring of the releases a condition precedent to the payment of the money, and there was, consequently, no reasonable

60 TAYLOR *et al. v.* MERRILL. [Sept. T.,

Opinion of the Court.

excuse for the delay in tendering performance. Before equity will assist him he must himself have been diligent in his efforts to comply with the contract on his part.

There is some evidence in the record that tends to impeach, in some degree, at least, the fairness of the entire transaction on the part of the appellee.

If it be true, as appellee insists, and it must be taken as true as against him for he asserts it both in his bill and in his testimony, that the written agreement alleged was executed and delivered to him on the fourteenth day of April, then it is also true that he was afterwards negotiating with the appellant, Taylor, for the verbal contract insisted upon, for the land, without disclosing to him that he then had his (Taylor's) written agreement in his possession. If, on the contrary, the contract was not then executed and delivered, but was afterwards executed and ante-dated, then the appellee must have known that the agents had no authority to make the contract, for he had himself applied to Taylor to sign a written contract which he states was, in substance, the same as the written one produced, and that Taylor refused to sign it unless the appellee would make the advance payment five hundred dollars, giving as a reason for his refusal, that he would not tie up so large an amount of property for the nominal sum of twenty-five dollars.

If there be any unfairness or reprehensible means used in obtaining the making of a contract, equity will never enforce a specific performance. The principals were together negotiating about the sale of the premises, and while the negotiations were still pending between them, the appellee takes a contract from the agents without ever disclosing it to the appellant in any of their interviews. This was bad faith on the part of the appellee as well as of the agents. They were all in the same city, and a few minutes' walk would have brought the parties all together, so that a full and fair understanding of the contract could have been obtained. *Robbins* v. *Butler et al.* 24 Ill. 387.

There is also another fact in the record that is not without its significance, and tends to impeach the good faith of the

transaction. The agents executed and delivered to appellee what purports to be the contract of appellant, Taylor, for the sale of the premises, which, by the force of its terms, would tie up for an indefinite period a very valuable piece of real estate, for the nominal sum of twenty-five dollars, and yet they do not even require the appellee to sign the contract, nor do they take back from him any agreement, note, bond or other obligation to secure the performance of the contract on the part of the appellee.

In the case of *Modisett v. Johnson,* 2 Black, 431, it was held that a court of equity must be satisfied that the claim is fair, just and reasonable; the contract equal in all its parts, and founded on a valuable consideration, before it will decree a specific performance.

In *Mortlock* v. *Butler,* 10 Ves. 292, it was said by the Lord Chancellor that "this court is not bound specifically to execute every contract, and if there was any sort of surprise that made it not fair and honest to call for an execution, he would not give the extraordinary relief of a specific performance."

This just and equitable rule has been recognized by all courts in this country and in England, and the cases that sustain it are numerous in both countries.

In no view that we have been able to take of this case, do we find the existence of a contract between the parties, either written or verbal, so fairly obtained and so equal in its terms, that a court of equity will enforce its specific performance, and the decree of the circuit court must, therefore, be reversed, and the bill dismissed.

*Decree reversed.*